COLFAX CORPORATION,
Plaintiff–Appellant,

v.

The ILLINOIS STATE TOLL HIGHWAY AUTHORITY and its chief counsel, Frank M. Howard, in his official and individual capacity; and the International Association of Heat and Frost Insulators Union Local 17 and its business manager, Michael O'Neill, in his official and individual capacity, Defendants–Appellees.

No. 95–2118.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 18, 1996.

Decided March 22, 1996.

Lawrence M. Cohen, Douglas M. Werman, S. Richard Pincus (argued), Fox & Grove, Chicago, IL, for Colfax Corporation.

John P. Morrison (argued), Michael J. Abernathy, David M. Novak, Bell, Boyd & Lloyd, Chicago, IL, for Illinois State Toll Highway Authority, Frank M. Howard.

Marvin Gittler (argued), Stephen J. Feinberg, Asher, Gittler, Greenfield, Cohen & D'Alba, Chicago, IL, John J. Toomey, Hugh B. Arnold, Arnold & Kadjank, Chicago, IL, for International Association of Heat and Frost Insulators, Union Local 17, Michael O'Neill.

Before COFFEY, DIANE P. WOOD, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

The Colfax Corporation submitted bids for asbestos removal from Illinois Tollway oases and maintenance buildings and as the lowest bidder was optimistic about receiving the work. When that did not happen, Colfax sued the Illinois State Toll Highway Authority and two labor unions—the International Association of Heat and Frost Insulators Union Local 17 and the Laborers International Union, Local 225—plus various officials of the three entities. Colfax appeals the dismissal of two counts of its amended complaint: those based on the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*, and the Civil Rights Act, 42 U.S.C. § 1983.

We review the dismissal of the complaint de novo, accepting as true its well-pleaded factual allegations and drawing all reasonable inferences for the benefit of Colfax. *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016 (7th Cir.1992). The dismissal of a complaint can be affirmed only if "it appears beyond doubt that [Colfax] can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957).

In the amended complaint, Colfax alleges that the Authority instituted a project for asbestos abatement and repair of some of its buildings. It advertised for bids on May 24, 1993. In the advertisement, the Authority stated that it might not award any contract and reserved the right to reject any and all bids. But on June 24, 1993, the Authority decided to award the work, subject to the proper execution of certain documents, to the lowest responsible bidder, which turned out to be Colfax. Also, as it turns out, the documents were never signed.

The Authority and the unions entered into a project labor agreement related to its tri-state widening project. The agreement barred contractors from locking out employees and prevented workers from striking, picketing, and engaging in conduct which would delay construction. Under the project labor agreement, the Authority agreed to contract only with employers who are bound by or are willing to observe the terms of the project agreement with the unions having jurisdiction over the type of work being performed.

The Authority informed Colfax on June 27, 1993, that the asbestos removal work would be subject to the project labor agreement. Colfax consented to sign the agreement. On July 15, 1993, a meeting was held with representatives of the company, the Authority, and Local 17 and Local 225, the relevant unions. Neither union had a labor agreement with Colfax and in fact had ongoing labor disputes with the company.

Both unions stated that they would not enter into project-specific agreements with Colfax but would allow Colfax to become a party to their existing areawide collective bargaining agreements. Colfax refused, and on July 29, 1993, the Authority rejected all bids, including that of Colfax.

Three weeks later, on August 19, 1993, the Authority again advertised for bids for asbestos abatement and repair work on its buildings. Once more, the advertisement stressed that the Authority might not award any contract and that it reserved the right to reject

all proposals. A multi-project labor agreement was attached to the advertisement. That agreement is similar to the project labor agreement; however, under the multi-project labor agreement, the Authority agreed to contract work only to employers who are or will become parties to areawide collective bargaining agreements with the unions having jurisdiction over the relevant work.

Colfax submitted a bid and once again was the low bidder. It informed the Authority that it would sign a project agreement but that any attempt to require it to sign an areawide collective bargaining agreement with Local 17 or Local 225 would be beyond the Authority's lawful powers and would be prohibited by federal law. On September 30, 1993, the Authority rejected all bids.

This lawsuit followed. Colfax filed claims alleging preemption under the NLRA and the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.*, and claims regarding violations of 42 U.S.C. § 1983 and the federal anti-trust laws. In addition, there were pendent state law claims. As we said, Colfax appeals the dismissal of the claims based on the NLRA and § 1983.[1]

The district court dismissed the disputed claims on the basis that the Authority's actions were not an impermissible attempt by a state to regulate labor relations, in contravention of the NLRA. Rather, the actions were taken by the Authority in its proprietary role as the owner of the project. Several issues swirl around in this appeal, only one of which requires an extended discussion.

■ That question is, at heart, whether the actions were in fact proprietary, or were some nefarious attempt by a state authority to regulate labor relations. In light of *Building & Construction Trades Council v. Associated Builders*, 507 U.S. 218, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993)—the now famous *"Boston Harbor"* case—the question need not detain us long.

■ A state's potential attempt to regulate labor is subject to the preemption doctrine. Because the NLRA contains no express preemption provision, courts are reluctant to infer preemption. It is not found unless an action conflicts with federal law or would frustrate the federal scheme, or unless it is clear from the totality of the circumstances that Congress intended to occupy the field. *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985). There are two distinct preemption principles. One is that state and local regulation is forbidden regarding activities which are "protected by § 7 of the [NLRA] or constitute an unfair labor practice under § 8." *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959). The other prohibits regulation of those activities which have been left "to be controlled by the free play of economic forces." *Lodge 76, Intern. Ass'n of Machinists and Aerospace Workers, AFL–CIO v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132, 147, 96 S.Ct. 2548, 2556–57, 49 L.Ed.2d 396 (1976).

In *"Boston Harbor,"* the Court made clear that while the doctrine of preemption prevents a state from regulating in preempted areas, a state does not engage in regulation "simply by acting within one of these protected areas." 507 U.S. at 227, 113 S.Ct. at 1196. A state may act within those areas if it is acting in a proprietary way:

> When a State owns and manages property, for example, it must interact with private participants in the marketplace. In so doing, the State is not subject to pre-emption by the NLRA, because pre-emption doctrines apply only to state *regulation.*

At 227, 113 S.Ct. at 1196.

As one might guess, the *"Boston Harbor"* case involved the cleanup of the Boston harbor. The Massachusetts Water Resources Authority (MWRA) is an independent government agency charged with providing water-supply services, sewage collection, disposal and treatment services. It was sued for failing to prevent pollution of the harbor and

---

1. Local 17 remains a party to the appeal; Local 225 was dismissed by order of this court on July 28, 1995.

was ordered to clean it up. The cleanup project was expected to cost $6.1 billion over 10 years. Understandably, MWRA was interested in preventing labor unrest during the project and so it accepted the suggestion of its project manager to negotiate a project labor agreement and require all subcontractors be bound by it.

Legal challenges followed. In one, various contractors filed a charge with the National Labor Relations Board alleging that the contract violated the NLRA. The Board found that the agreement was a valid prehire agreement and that the agreement limiting work to contractors who agreed to abide by the agreement was lawful.

In the other challenge, resulting in the *"Boston Harbor"* decision, contractors alleged, among other things, that the MWRA's actions were preempted. The Supreme Court found that the MWRA's actions were proprietary, not regulatory, and were therefore not preempted. The actions of the MWRA were distinguished from those in *Wisconsin Dep't of Industry v. Gould,* 475 U.S. 282, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986), on which Colfax relies so heavily in this case. In *Gould,* the Court considered a state statute which prohibited state purchasing agents from procuring products from persons or firms that had violated the NLRA three times within a five-year period. The Court found that the statute was preempted by the NLRA.

The MWRA, on the other hand, was the owner of a specific project, attempting to keep labor peace and get the job done. As the owner, it was requiring the type of labor agreement specifically allowed under the provisos found in § 158(e) and (f). Those sections allow employers in the construction industry to enter into prehire agreements and allow requiring an employer not to hire other contractors on a project site unless they agree to be bound by the labor agreement. The court stated that "[t]o the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a prehire agreement, a public entity *as purchaser* should be permitted to do the same." At 231, 113 S.Ct. at 1198.

In support of its position that the action of the Authority in this case is preempted under the reasoning of *Gould,* rather than allowed under *"Boston Harbor,"* Colfax draws our attention to the recent decision of the *Chamber of Commerce of U.S. v. Reich,* 74 F.3d 1322 (C.A.D.C.1996). The court considered whether an executive order was in conflict with the NLRA. The order stated that federal contracting agencies "shall not contract with employers that permanently replace lawfully striking employees." The court determined that the order was an attempt to regulate labor and was subject to both *Machinists* and *Garmon* preemption. In arriving at that conclusion, the court considered the arguments on one side that the case was controlled by *Gould* and on the other than it was controlled by *"Boston Harbor."* The court agreed that the order was like the statute that the state of Wisconsin enacted in *Gould.* We are not surprised by that decision.

The case before us, on the other hand, is much more like *"Boston Harbor."* Illinois has not enacted a statute. The Authority has not passed a general rule. The Authority was contracting for services on a specific project. In fact, perhaps because of the obvious similarities between *"Boston Harbor"* and the present case, Colfax says, "Ah, yes," but goes on to argue that here, even though the Authority looks like a proprietor, its real purpose is to regulate labor and therefore its actions are preempted. This argument is premised on the fact that in the second bid, Colfax would have been required to be a party to areawide collective bargaining agreements with the unions, not just a job-specific agreement as in *"Boston Harbor."* We reject the argument.

The case is indistinguishable from *"Boston Harbor"* except as to the scope of the bargaining agreement involved. And *"Boston Harbor"* leaves open the door to the kind of agreement contemplated here. As we stated, the Court made clear that when acting as a proprietor, a state may do what a private contractor would do. In discussing what a private contractor may do under the construction industry provisions of the NLRA, the Court cited *Woelke & Romero Framing,*

*Inc. v. NLRB,* 456 U.S. 645, 102 S.Ct. 2071, 72 L.Ed.2d 398 (1982). In *Woelke,* the Court specifically considered subcontracting agreements which were not limited to a particular jobsite and determined that the proviso in 29 U.S.C. § 158(e) allows, in the construction industry, agreements "that would prohibit the subcontracting of jobsite work to nonunion firms." At 662, 102 S.Ct. at 2081. It is clear that a private entity could do what the Authority has done. In fact, at oral argument, though not in its briefs, Colfax conceded the point. We find that, like a private company, the Authority could demand that Colfax abide by the multi-project labor agreement.

Here, the Authority was attempting to keep labor peace. It was aware of existing serious conflicts between Colfax and the very unions involved in the project. It chose to contract only with those companies who were willing to sign collective bargaining agreements. So long as that is true and the frontier is pushed no farther from *"Boston Harbor"* than it is here, we will not travel where Colfax urges; we will not go behind the contract to determine whether the Authority's real, but secret, motive was to regulate labor. It follows that if the Authority's actions are not preempted by the NLRA, there is no violation of federal law to form the basis for a claim pursuant to § 1983.

Colfax also argues that the collective bargaining agreements which it would have been required to sign are illegal. That is not a matter for the courts. It is given over to the jurisdiction of the National Labor Relations Board. *See San Diego Building Trades v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). The judgment of the district court is AFFIRMED.

