In the
# United States Court of Appeals
### For the Seventh Circuit

No. 05-1531

METROPOLITAN MILWAUKEE ASSOCIATION OF COMMERCE,

*Plaintiff-Appellant*,

*v.*

MILWAUKEE COUNTY,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 01-C-0149—**Lynn Adelman**, *Judge*.

ARGUED SEPTEMBER 12, 2005—DECIDED DECEMBER 5, 2005

Before POSNER, ROVNER, and WILLIAMS, *Circuit Judges*.

POSNER, *Circuit Judge*. This is a suit to enjoin enforcement of Chapter 31 of the General Ordinances of Milwaukee County, primarily on the ground that the chapter is pre-empted by the National Labor Relations Act, 29 U.S.C. §§ 151 *et seq*. (We will not have to discuss the plaintiff's other grounds.) Chapter 31 requires firms that have contracts with the County for the provision of transportation and other services for elderly and disabled County residents to negotiate "labor peace agreements" with any union that wants to organize employees who work on County con-

tracts. Few of the contractors were unionized when the ordinance was adopted in 2000. The plaintiff, a business association that includes contractors affected by Chapter 31, appeals from the dismissal of the suit on the County's motion for summary judgment.

The ordinance requires the mandatory labor-peace agreement to contain a variety of provisions, such as "language and procedures prohibiting the employer or the labor organization from coercing or intimidating employees, explicitly or implicitly, in selecting or not select-ing a bargaining representative." General Ordinances, § 31.02(f)(7). If the parties cannot agree on the terms of their labor-peace agreement, an arbitrator will specify them. § 31.03(b). An employer who fails to correct a violation of the labor-peace agreement can be terminated as a County contractor. § 31.05(a). Although Chapter 31 is supported by and tilted in favor of unions (among the other mandatory provisions of a labor-peace agreement, the employer must furnish the union with "a complete and accurate list of the names, addresses and phone numbers" of those of his employees who provide services to the County, § 31.02(f)(3)), the ordinance does forbid the union and its members to engage in any "economic action" against the employer so long as he complies with the agreement. § 31.02(f)(6). But no sanction is specified for a union that violates this provision other than to excuse the employer from further compliance with Chapter 31 in regard to that union. § 31.04(a).

There is no doubt that if the County weren't a party to contracts with the employers who are affected by Chapter 31, the ordinance would be preempted by the National Labor Relations Act. States and their subdivisions are not permitted to regulate activities that are either expressly

permitted or forbidden by the Act or that are "reserved [by the Act] for market freedom." *Building & Construction Trades Council v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218, 226-27 (1993) (*Boston Harbor*). But if the state is intervening in the labor relations just of firms from which it buys services, and it is doing so in order to reduce the cost or increase the quality of those services rather than to displace the authority of the National Labor Relations Act and the National Labor Relations Board, there is no preemption. That is the holding of the *Boston Harbor* case; see also *Colfax Corp. v. Illinois State Toll Highway Authority*, 79 F.3d 631, 633-35 (7th Cir. 1996); *Hotel Employees & Restaurant Employees Union, Local 57 v. Sage Hospitality Resources, L.L.C.*, 390 F.3d 206, 216 (3d Cir. 2004); *Building & Construction Trades Dept., AFL-CIO v. Allbaugh*, 295 F.3d 28, 34-35 (D.C. Cir. 2002). The state has the same interest as any other purchaser in imposing conditions in contracts with its sellers that will benefit the state in its capacity as a buyer, as distinct from enforcing or modifying the NLRA. *Boston Harbor, supra*, 507 U.S. at 231-33; *Wisconsin Dept. of Industry, Labor & Human Relations v. Gould, Inc.*, 475 U.S. 282, 290-91 (1986); *Colfax Corp. v. Illinois State Toll Highway Authority, supra*, 79 F.3d at 635.

It is implicit in this distinction that the state may not invoke its spending power and argue that because the greater power includes the lesser and a state doesn't have to hire a particular contractor, it can condition payment to him on his agreeing to submit to a scheme of labor relations that the state considers an improvement over the National Labor Relations Act. And thus in *Wisconsin Dept. of Industry, Labor & Human Relations v. Gould, Inc., supra*, 475 U.S. at 287-89 (1986), the Supreme Court struck down a Wisconsin statute that forbade state procurement agents to hire any contractor that had been found by judicially enforced orders of the

NLRB to have committed three or more violations of federal labor law in the previous five years. The state had argued that "the statutory scheme invoked against [the employer] escapes pre-emption because it is an exercise of the State's spending power rather than its regulatory power." The Court called this "a distinction without a difference, at least in this case, because on its face the debarment statute serves plainly as a means of enforcing the NLRA." *Id*. at 287. "That Wisconsin has chosen to use its spending power rather than its police power does not significantly lessen the inherent potential for conflict when 'two separate remedies are brought to bear on the same activity.' To uphold the Wisconsin penalty simply because it operates through state purchasing decisions therefore would make little sense." *Id*. at 289 (citation omitted).

*Gould* might appear to be inapplicable to our case on the ground that there the state was penalizing contractors for conduct outside the scope of the state's contracts; the three or more adjudicated violations of the National Labor Relations Act might have occurred in labor disputes arising from work pursuant to contracts to which the state was not a party. But the principle of that decision goes deeper; it is that the spending power may not be used as a pretext for regulating labor relations. As a practical matter, moreover, the labor-peace agreements at issue in this case are bound to affect the contractors' labor relations even when the contracts are with private hospitals and nursing homes. It would hardly be feasible for the contractors to segregate their workforces, with one part governed by labor-peace agreements and the other not even though the two groups of workers would be doing identical work, just for different customers. Cf. *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1338 (D.C. Cir. 1996). There is nothing distinctive about the work that the contractors do for the

County; doubtless all or most of their employees who work on County contracts also work on private ones. This means that disputes arising out of the private contracts, though unrelated to any spending or procurement activity of the County, are in fact regulated by the labor-peace agreements and therefore made subject to the County's philosophy of labor relations.

Any doubt that the agreements have a spillover effect on labor disputes arising out of the contractors' non-County contracts is dispelled by the language of the ordinance. Although the obligation to negotiate a labor-peace agreement kicks in only when a union seeks to represent employees who do work on the employer's contracts with the County, § 31.03, most of the agreement itself applies to the employer's other employees—employees who may never work on a County contract—as well as to the work that is not County-related of the employees who do work part of the time on the County contracts. In fact, all but one of the terms that the agreement must contain apply to "employees," §§ 31.02(f)(1), (2), (4), (7), rather than just to "employees of the employer [who are] working within the appropriate bargaining unit," which is to say a unit limited to "those employees whose work results from or has some tangible relationship to the provision of contractual services purchased by Milwaukee County." § 31.02(f)(3).

The sheer impracticability of a separation between County and other work is illustrated by the requirement of the ordinance that "no employee, individually or in a group, shall be required to attend a meeting or event that is intended to influence his or her decision in selecting or not selecting a bargaining representative." § 31.02(f)(7). Federal labor law allows employers to require their employees to

attend meetings, on the employer's premises and during working time, in which the employer expresses his opposition to unionization. *Beverly California Corp. v. NLRB*, 227 F.3d 817, 846 (7th Cir. 2000); *Livingston Shirt Corp.*, 107 N.L.R.B. 400, 406 (1953). An employee who spends only 10 percent of his time on County business is clearly covered by the quoted provision of Chapter 31. Probably he is covered if he spends zero percent of his time on County business, for the provision, though it must be included in a labor-peace agreement, is not limited to members of the County bargaining unit. Even if he does some County work, to the extent that he does private work as well the ordinance is regulating labor relations arising from activities to which the County is not a party. Imagine—and for all we know this is the case—that *all* of a company's employees spend some fraction of their time on County contract work. Then the employer could never require any of its employees to attend a meeting at which it expressed opposition to unionization. This would give the union a leg up to organize the company's entire workforce even if the vast majority of the employees' time was devoted to the employer's private contracts. That is the kind of favoritism that the National Labor Relations Act anathematizes.

Although the County cannot use its spending power as a handle for regulating the labor relations of recipients of County money, it has, when it is buying services, the same rights as other purchasers. We must therefore consider whether the labor-peace agreements are a reasonable, good-faith measure for enabling Milwaukee County to get a better quality of service from its contractors. One reason to doubt this is that, as we have just seen, the agreements are not limited to the provision of services to the County. Another reason is that they are not actually tailored to preventing work stoppages, though such prevention is the only permis-

sible rationale that the County has offered for requiring its contractors to negotiate such agreements. For while it is true that union organizing campaigns can result in work stoppages that interrupt service, service interruptions are a risk that any recipient of a continuing service faces. The usual way of dealing with the problem is to include contract terms that by adding sticks or carrots or both give the provider of the service a compelling incentive to take effective measures to avoid stoppages. The buyer can offer a premium for timely performance and insist on the inclusion of a stiff liquidated-damages provision as a sanction for untimely performance; there is also, as a further incentive to good performance, the implicit threat of refusing to renew the contract if performance is unsatisfactory.

The County need only write a strong sanction for work stoppages into its contracts to protect its interest as a buyer of services, and then, if labor-peace agreements really are efficacious methods of preventing work stoppages, employers will voluntarily offer such agreements to unions that want to organize their employees in order to reduce the likelihood of having to pay damages to the County. Employers know better how to keep their workers from striking than purchasers of the employers' services, such as Milwaukee County, do.

Generalizing, we see that the existence of effective *contractual* remedies for service interruptions eliminates the need for states or their subdivisions to create a special regime for the labor relations of their contractors. The inference is inescapable that the County is trying to substitute its own labor-management philosophy for that of the National Labor Relations Act. It is no answer that sanctions for breach of contract after a stoppage has occurred cannot guarantee uninterrupted service. Sanctions for violating a

labor-peace agreement are also imposed after the fact. Nothing prevents an employer or a union from violating such an agreement, just as nothing prevents the employer from violating his contract with the County. In either case there is a sanction, and the timing of its imposition is the same.

We emphasize that a labor-peace agreement is as likely to increase as to decrease work stoppages, a consequence manifestly inconsistent with an employer's legitimate concern with avoiding stoppages. The labor-peace agreement could be complied with yet a stoppage occur anyway after the employer's workforce had been unionized. Indeed, by making it easier for unions to organize, Chapter 31 is calculated to result in more contractors' workforces being unionized and if this happens there will be an increased risk of strikes—not in the organizing phase but later, when the union is pressing for a collective bargaining agreement or complaining of unfair labor practices. The County does not require its contractors to negotiate no-strike clauses in collective bargaining agreements with their unionized workers, common as such clauses are.

Five-sixths of the County's contractors are not subject to the requirement of negotiating labor-peace agreements. Yet they are no less vulnerable to work stoppages than the providers of services for elderly and disabled persons. The failure of a road contractor to complete repairs on a county highway could delay the elderly and the disabled, together with many other people, as effectively as a work stoppage involving the transporters of the elderly and the disabled; yet the County is apparently content with whatever provisions it has inserted in its contracts to discourage such failures.

The mismatch between the interest in uninterrupted service and the requirement of labor-peace agreements further demonstrates that the County's motive is dissatisfaction with the balance that the National Labor Relations Act strikes between unions and management rather than concern with service interruptions. This is in contrast to the leading case that recognizes a market-participant exception to NLRA preemption—*Boston Harbor*. The Massachusetts Water Resources Authority was under a court order to complete a major construction project by a specified deadline. The Authority could not afford delay. It is customary in the building industry to negotiate pre-hire collective bargaining contracts because there is no stable workforce with which to negotiate after the project is commenced, and all the Authority wanted to do was require its contractors to do that. As the Court explained, if a private purchaser of construction services required his contractors to negotiate pre-hire agreements, there would be no violation of the National Labor Relations Act (the Act authorizes such agreements, 29 U.S.C. § 158(f)); why should it make a difference if the purchaser is a public rather than a private entity? 507 U.S. at 231. As we said in a similar case, "a private entity could do what the Authority has done." *Colfax Corp. v. Illinois State Toll Highway Authority*, *supra*, 79 F.3d at 635. Pre-hire agreements are a tried and true remedy for construction stoppages owing to labor disputes, which presumably is why the National Labor Relations Act authorizes them, and Boston could not afford such a stoppage. So there was no basis for suspicion that the Authority's action in requiring such agreements was a pretext for regulation. We take from *Boston Harbor* the rule that public entities can impose pre-hire agreements on their contractors, just as private entities can. The rule does not embrace this case. There has been no similar showing that

labor-peace agreements are "tried and true." They are not recognized by the National Labor Relations Act. And the County points us to no case in which a purchaser or provider of services similar (or for that matter dissimilar) to those at issue in this case has required or imposed such an agreement.

And so the inference of pretext arising from the terms of the ordinance and the spillover effect on private labor relations that the ordinance creates has not been rebutted. The County has a legitimate interest in avoiding interruptions in the services it furnishes its residents, but there is nothing to suggest that ordinary contract remedies are inadequate or if so that labor-peace agreements are a reasonable means to the end of preventing such interruptions. On the contrary, we have seen that labor-peace agreements might well increase the frequency of service interruptions. The claim that the County is requiring labor-peace agreements in order to further its interest as a buyer of services cannot withstand scrutiny. On this record, it is a pretext to regulate the labor relations of companies that happen, perhaps quite incidentally, to do some County work.

The judgment is reversed with directions to enter judgment for the plaintiff.

REVERSED WITH DIRECTIONS.

No. 05-1531                                                              11

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*