2022 IL App (1st) 210850

No. 1-21-0850

Opinion filed December 30, 2022

FIFTH DIVISION

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE CITY OF CHICAGO, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 20 CH 5499 |
| | ) | |
| INTERNATIONAL BROTHERHOOD | ) | Honorable |
| OF ELECTRICAL WORKERS, | ) | Anna M. Loftus, |
| LOCAL NO. 9, | ) | Judge presiding. |
| | ) | |
| Defendant-Appellant. | ) | |

JUSTICE MITCHELL delivered the judgment of the court, with opinion.
Justice Delort and Justice Lyle concurred in the judgment and opinion.

**OPINION**

¶ 1   Defendant International Brotherhood of Electrical Workers, Local No. 9, appeals the

circuit court's order vacating an arbitration award. The arbitrator found that plaintiff City of

Chicago had permitted nonunion contractors to perform electrical work on City-owned light and

traffic poles in violation of its multiproject labor agreement with IBEW. As part of the arbitration

award, the City must ensure that any entity permitted to work on the City's property is a signatory

to the parties' collective bargaining agreement. The circuit court concluded that the award

contravened federal labor law—specifically, the National Labor Relations Act (NLRA) (29 U.S.C.

§ 151 *et seq.* (2018))—which preempts state and local regulation of private labor relations. The

sole issue presented by this appeal is whether the arbitration award requires the City to "regulate"

private labor relations. For the following reasons, we reverse the circuit court's order vacating the arbitration award and remand the cause for further proceedings.

¶ 2                                    BACKGROUND

¶ 3      The newest generation of wireless broadband technology known as "5G" requires a digital antennae system of small-cell devices to supplement the coverage provided by traditional cellular towers. As compared to predecessor technologies, 5G transmits data at exceptional speeds but over relatively short distances, requiring telecommunications companies to install their equipment in more locations to facilitate service. Through a permitting process, the City allows telecommunications companies to install small-cell devices on light and traffic poles in exchange for annual fees. Chicago Municipal Code § 10-30-020 (amended Nov. 19, 2008); Chicago Municipal Code § 10-30-040 (amended Nov. 7, 2018). To mount the small-cell devices, the telecommunications companies must install new fiberoptic cables and conduit on the City's light and traffic poles, and in some instances, the poles must be upgraded or replaced altogether.

¶ 4      From July 2007 through July 2017, the City and the IBEW were parties to a collective bargaining agreement establishing the terms and conditions for the City's employment of linemen, lamp maintenance workers, and other electricians who maintain the City's electrical poles. In 2010, the City and IBEW, along with a coalition of other labor organizations, executed a multiproject labor agreement incorporated into the parties' collective bargaining agreement by reference. The multiproject labor agreement's first paragraph provides:

> "[The City] shall not contract or subcontract, *nor permit* any other *** entity to
>
> contract or subcontract, any construction, demolition, rehabilitation or renovation
>
> work for the Project work covered under this Agreement or within the trade

jurisdiction of the signatory labor organization *** unless such work is performed by a person, firm or company signatory, willing to become a signatory, to the applicable area-wide collective bargaining agreement(s) with the union(s) ***." (Emphasis added.)

¶ 5　IBEW filed a grievance alleging that the City had violated the multiproject labor agreement by permitting telecommunications companies to employ nonunion electricians to work on City-owned traffic and light poles within IBEW's trade jurisdiction. The City disputed that the multiproject labor agreement covered the installation and maintenance of the small-cell devices because the City had not contracted or subcontracted the work, and IBEW's grievance advanced to arbitration. Following a hearing, the arbitrator decided that the multiproject labor agreement encompassed the telecommunications companies' work on the City's property and issued an award requiring the City (1) to stop granting permits to entities who used nonunion workers and (2) to ensure that all entities who did work on the traffic and light poles had signed the collective bargaining agreement:

"The appropriate remedy is to:

1. Cease and desist from permitting entities which have not signed a collective bargaining agreement with the Union to perform distributive antennae system and other small cell technology work on City-owned light poles and traffic poles; and

2. [Take] all necessary steps to ensure that entities performing distributive antennae system and other small cell technology work on City-owned light poles

and traffic poles are or promptly become signatories to the applicable area-wide collective bargaining agreement for the purposes of performing that work ***."

¶ 6 The City filed a petition in the circuit court seeking to vacate the arbitration award and IBEW subsequently counterclaimed to have the award affirmed pursuant to the Uniform Arbitration Act (710 ILCS 5/11, 12 (West 2020)). Among the City's arguments for vacating the award was that it contravened public policy by requiring the City to ensure that private telecommunications providers' employees became union members—in other words, the award is tantamount to the City's regulation of activities protected or prohibited, or arguably protected or prohibited, by the NLRA (29 U.S.C. § 151 *et seq.* (2018))—which federal law prohibits. *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959). The circuit court agreed:

"[T]he award requires a private entity, with whom the state actor has no contractual relationship, to sign a CBA, stripping the private entity's employees of the ability to bargain collectively. This setup runs afoul of the NLRA and constitutes regulation."

¶ 7 On this basis, the circuit court vacated the arbitration award on June 30, 2021. This timely appeal followed. Ill. S. Ct. R. 303 (eff. July 1, 2017).

¶ 8 ANALYSIS

¶ 9 Did the arbitrator construe the City's obligations under the collective bargaining and multiproject labor agreements in violation of federal labor law? To resolve this question, we must determine whether the City, by conditioning telecommunications companies' access to its property on their becoming union signatories, would be engaged in "regulation." IBEW argues that the arbitration award requires the City to take actions consistent with those of a property owner or

proprietor, not of a regulator. The City, on the other hand, maintains that it has no proprietary interest in the telecommunications companies' installation work, and thus, requiring telecommunications companies to become signatories to the collective bargaining agreement as part of its permitting process is tantamount to regulation. Whether an arbitration award violates public policy is a question of law that we review *de novo*. *City of Chicago v. Fraternal Order of Police, Chicago Lodge No. 7*, 2020 IL 124831, ¶ 26.

¶ 10      We will not enforce arbitration awards "which otherwise derive their essence from a collective-bargaining agreement" but are "repugnant to established norms of public policy." *American Federation of State, County & Municipal Employees, AFL-CIO v. Department of Central Management Services*, 173 Ill. 2d 299, 306-07 (1996) (*AFSCME*). The exception is narrow: the collective bargaining agreement, *as interpreted* by the arbitrator, must clearly violate some well-defined and dominant public policy. *Id.* at 307-08. Relevant to this case, the NLRA reflects Congress's stated intent to create a uniform, nationwide body of labor law interpreted and administered by the National Labor Relations Board. *New York Telephone Co. v. New York State Department of Labor*, 440 U.S. 519, 527-28 (1979). Because parallel regulatory schemes enacted by 50 different states and their political subdivisions would frustrate Congress's goal, it is well established that the NLRA displaces state and local regulation of labor relations. See U.S. Const., art. VI; *Wisconsin Department of Industry, Labor & Human Relations v. Gould Inc.*, 475 U.S. 282, 286 (1986).

¶ 11      Although state and local governments may not regulate labor activities that the NLRA arguably protects or prohibits (*Garmon*, 359 U.S. at 244-45) or that Congress intended " 'to be controlled by the free play of economic forces' " (*Lodge 76, International Ass'n of Machinists &*

*Aerospace Workers v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132, 140 (1976)), the

NLRA does not displace all legitimate state activity that affects labor. *Building & Construction*

*Trades Council v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.*, 507

U.S. 218, 226-27 (1993) (*Boston Harbor*).

> "When a State owns and manages property, for example, it must interact with
>
> private participants in the marketplace. In so doing, the State is not subject to pre-
>
> emption by the NLRA, because pre-emption doctrines apply only to state
>
> *regulation*." (Emphasis in original.) *Id.* at 227.

Thus, the City, like any other "market participant," may freely engage in the efficient procurement

of goods and services without offending preemption principles. *Gould*, 475 U.S. at 289.[1]

¶ 12    Here, there is no doubt that the City, in executing the multiproject labor agreement, was

acting as a private developer or property owner, not as a policymaker, in procuring electrical and

other construction-related services. Although not tied to any specific project, this is the exact type

of "market participation" contemplated in *Boston Harbor*. *Boston Harbor*, 507 U.S. at 231-32; see

also *Colfax Corp. v. Illinois State Toll Highway Authority*, 79 F.3d 631, 634-35 (7th Cir. 1996)

(the State did not regulate labor by requiring a contractor to sign an area wide bargaining agreement,

---

[1]Illinois courts have not addressed what constitutes a "market participant" for the purposes of NLRA preemption. The federal circuits apply slightly different tests. The Third Circuit requires a government *both* (1) act to advance a proprietary interest *and* (2) narrowly tailor its actions to avoid a regulatory effect. See, *e.g.*, *Associated Builders & Contractors Inc. New Jersey Chapter v. City of Jersey City*, 836 F.3d 412, 418 (3d Cir. 2016). The Ninth Circuit applies the same test but in the disjunctive: the government *either* (1) acts to advance a proprietary interest *or* (2) tailors its actions to avoid a regulatory effect. See, *e.g.*, *Johnson v. Rancho Santiago Community College District*, 623 F.3d 1011, 1024 (9th Cir. 2010). The Seventh Circuit holds only that the NLRA forbids actions that are regulatory in nature. See, *e.g.*, *Northern Illinois Chapter of Associated Builders & Contractors, Inc. v. Lavin*, 431 F.3d 1004, 1006 (7th Cir. 2005). Under any of these tests, however, the result is the same: the award's signatory requirement does not amount to regulation.

which was not limited to any specific jobsite). While the City does not contest its authority to enter the multiproject labor agreement generally, it argues that the arbitration award compels it to impose labor conditions on the telecommunications companies despite having no proprietary interest in their installation work. The City's argument relies on the absence of any contractual relationship between the parties.

¶ 13    But the fact that the telecommunications companies do not install small-cell devices on the City's behalf is not dispositive of whether the City retains an interest in the electrical work performed on its light and traffic poles. See *Boston Harbor*, 507 U.S. at 227 ("[T]he NLRA was intended to supplant state labor *regulation*, not all legitimate state activity that affects labor." (Emphasis in original.)). *Boston Harbor* does not hold that state actions affecting labor relations are consistent with federal law *only* when conducted as a market participant: "The need to distinguish regulation from other governmental activity is the Court's theme." *Northern Illinois Chapter of Associated Builders & Contractors, Inc. v. Lavin*, 431 F.3d 1004, 1006 (7th Cir. 2005). In *Lavin*, for instance, the state granted subsidies for renewable-fuel plants on the condition that the recipients entered a project labor agreement. *Id.* at 1005. The State was "not the proprietor *of* anything"—it did not own any project, either before or after granting the subsidies, did not hire contractors, or invest in any project through bonds. (Emphasis in original.) *Id.* at 1006. As that court explained, "All it has done is set a condition on grants to private proprietors." *Id.*

¶ 14    The City's argument also ignores that the City does not simply issue permits and charge annual fees. The City grants access to its property and requires the telecommunications companies to reserve certain wires and cables for the City's own uses. In the event that a pole cannot support the additional fiberoptic cables and conduit, the telecommunications companies must replace the

poles altogether. Thus, the telecommunications companies' installation of their small-cell devices directly implicates the City's ownership and management interests. See *Airline Service Providers Ass'n v. Los Angeles World Airports*, 873 F.3d 1074, 1081 & n.6 (9th Cir. 2017) (rejecting that the city's licensing scheme was a " 'purely regulatory function' " where the city took "action to protect its proprietary interest in running the airport smoothly").

¶ 15    The award's signatory requirement is also sufficiently tailored to avoid a regulatory effect, as its enforcement applies only to telecommunications companies that "perform distributive antennae system and other small cell technology work on City-owned light poles and traffic poles." See *Metropolitan Milwaukee Ass'n of Commerce v. Milwaukee County*, 431 F.3d 277, 279 (7th Cir. 2005) (state spending power may not be used a pretext for broadly setting labor policy in an industry); *Lavin*, 431 F.3d at 1007 ("Because Illinois has limited its condition to the project financed by the subsidy, it has not engaged in 'regulation' ***."). Nor does it create a supplemental sanction for labor violations, thus contravening the National Labor Relations Board's exclusive jurisdiction. See, *e.g.*, *Gould*, 475 U.S. at 287 ("[T]he debarment statute serves plainly as a means of enforcing the NLRA."). Any telecommunications company that wishes to avoid the signatory requirement may instead deploy their equipment on other property.

¶ 16    The City relies on *City of Portland v. United States*, 969 F.3d 1020, 1035 (9th Cir. 2020), for the proposition that *any* government restriction on access to public rights-of-way is regulatory. In *Portland*, however, the issue of preemption arose under an entirely different regulatory regime, the Telecommunications Act of 1996 (47 U.S.C. §§ 253, 332 (2018)). There, several municipalities had passed ordinances regulating, among other aspects, the aesthetics of their traffic poles in ways that materially inhibited private telecommunications companies' ability to install 5G technology.

*Portland*, 969 F.3d at 1035. The court held that these ordinances served the municipalities' regulatory objectives rather than their financial interests. *Id.* at 1045. Here, in contrast, the labor conditions arise not under the City's permitting ordinances but as one of the City's contractual obligations under the multiproject labor agreement.[2]

¶ 17    The City last contends that the arbitration award impinges upon the collective bargaining rights of telecommunications companies' employees, but that issue is beyond our jurisdiction. See *Colfax Corp.*, 79 F.3d at 635 ("That is not a matter for the courts. It is given over to the jurisdiction of the National Labor Relations Board."); *Soltysik v. Parsec, Inc.*, 2022 IL App (2d) 200563, ¶ 33 (neither state nor federal courts generally have jurisdiction over lawsuits alleging NLRA violations). The question is whether the arbitration award contravenes public policy by requiring the City to regulate labor in a manner preempted by the NLRA. For the reasons discussed, we hold that it does not.

¶ 18                                        ****

¶ 19    Arbitration is meant to provide finality. See 710 ILCS 5/12 (West 2020); *Rauh v. Rockford Products Corp.*, 143 Ill. 2d 377, 394 (1991). For an award to be vacated on public policy grounds,

---

[2]The City also argues, for the first time on appeal, that the arbitration award contravenes the federal policy, as evinced in the Telecommunications Act of 1996, of removing local barriers to providers' expansion of coverage. "It is well settled that issues not raised in the trial court are deemed waived and may not be raised for the first time on appeal." *Haudrich v. Howmedica, Inc.*, 169 Ill. 2d 525, 536 (1996). This prohibition on raising new arguments applies to vacatur appeals. *Forest Preserve District v. Illinois Fraternal Order of Police Labor Council*, 2017 IL App (1st) 161499, ¶ 26. Federal preemption arguments are not an exception to this rule. *Haudrich*, 169 Ill. 2d at 537. In an event, the City has not shown that the arbitration award's union signatory requirement constitutes a regulatory barrier that would violate this policy. See *AFSCME*, 173 Ill. 2d at 307-08.

not only must the public policy be well-defined and dominant but a violation must be clearly shown. *AFSCME*, 173 Ill. 2d at 307. For the reasons stated above, the City has not met this standard.

¶ 20                                   CONCLUSION

¶ 21    We reverse the circuit court's June 30, 2021, order vacating the arbitration award, and we remand the cause for further proceedings.

¶ 22    Reversed and remanded.

No. 1-21-0850

---

2022 IL App (1st) 210850

---

**Decision Under Review:** Appeal from the Circuit Court of Cook County, No. 20-CH-5499; the Hon. Anna M. Loftus, Judge, presiding.

---

**Attorneys for Appellant:** Margaret Angelucci and Matt Pierce, of Asher, Gittler & D'Alba, Ltd., of Chicago, for appellant.

---

**Attorneys for Appellee:** Celia Meza, Corporation Counsel, of Chicago (Myriam Zreczny Kasper, Suzanne M. Loose, and Sara K. Hornstra, Assistant Corporation Counsel, of counsel), for appellee.

---