(Slip Opinion)      OCTOBER  TERM,  2007      1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA ET AL. *v.* BROWN, ATTORNEY GENERAL OF CALIFORNIA, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 06–939.   Argued March 19, 2008—Decided June 19, 2008

Organizations whose members do business with California sued to en-
join enforcement of "Assembly Bill 1889" (AB 1889), which, among
other things, prohibits employers that receive state grants or more
than $10,000 in state program funds per year from using the funds
"to assist, promote, or deter union organizing."  Cal. Govt. Code Ann.
§§16645.2(a), 16645.7(a).  The District Court granted the plaintiffs
partial summary judgment, holding that the National Labor Rela-
tions Act (NLRA) pre-empts §§16645.2 and 16645.7 because they
regulate employer speech about union organizing under circum-
stances in which Congress intended free debate.  The Ninth Circuit
reversed, concluding that Congress did not intend to preclude States
from imposing such restrictions on the use of their own funds.

*Held:* Sections  16645.2 and 16645.7 are pre-empted by the NLRA.
   Pp. 4–16.

   (a) The NLRA contains no express pre-emption provision, but this
Court has held pre-emption necessary to implement federal labor pol-
icy where, *inter alia*, Congress intended particular conduct to "be un-
regulated because left 'to be controlled by the free play of economic
forces.' " *Machinists* v. *Wisconsin Employment Relations Comm'n*, 427
U. S. 132, 140.  Pp. 4–5.

   (b) Sections 16645.2 and 16645.7 are pre-empted under *Machinists*
because they regulate within "a zone protected and reserved for mar-
ket  freedom."   *Building  &  Constr.  Trades  Council* v. *Associated
Builders & Contractors of Mass./R. I., Inc.*, 507 U. S. 218, 227.  In
1947, the Taft-Hartley Act amended the NLRA by, among other

things, adding §8(c), which protects from National Labor Relations Board (NLRB) regulation noncoercive speech by both unions and employers about labor organizing. The section both responded to prior NLRB rulings that employers' attempts to persuade employees not to organize amounted to coercion prohibited as an unfair labor practice by the previous version of §8 and manifested a "congressional intent to encourage free debate on issues dividing labor and management." *Linn* v. *Plant Guard Workers*, 383 U. S. 53, 62. Congress' express protection of free debate forcefully buttresses the pre-emption analysis in this case. California's policy judgment that partisan employer speech necessarily interferes with an employee's choice about union representation is the same policy judgment that Congress renounced when it amended the NLRA to preclude regulation of noncoercive speech as an unfair labor practice. To the extent §§16645.2 and 16645.7 actually further AB 1889's express goal, they are unequivocally pre-empted. Pp. 5–8.

(c) The Ninth Circuit's reasons for concluding that *Machinists* did not pre-empt §§16645.2 and 16645.7—(1) that AB 1889's spending restrictions apply only to the *use* of state funds, not to their *receipt;* (2) that Congress did not leave the zone of activity free from *all* regulation, in that the NLRB still regulates employer speech on the eve of union elections; and (3) that California modeled AB 1889 on federal statutes, *e.g.,* the Workforce Investment Act—are not persuasive. Pp. 8–16.

463 F. 3d 1076, reversed and remanded.

STEVENS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, SOUTER, THOMAS, and ALITO, JJ., joined. BREYER, J., filed a dissenting opinion, in which GINSBURG, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 06–939

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, ET AL., PETITIONERS *v.* EDMUND G. BROWN, JR., ATTORNEY GENERAL OF CALIFORNIA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 19, 2008]

JUSTICE STEVENS delivered the opinion of the Court.

A California statute known as "Assembly Bill 1889" (AB 1889) prohibits several classes of employers that receive state funds from using the funds "to assist, promote, or deter union organizing." See Cal. Govt. Code Ann. §§16645–16649 (West Supp. 2008). The question presented to us is whether two of its provisions—§16645.2, applicable to grant recipients, and §16645.7, applicable to private employers receiving more than $10,000 in program funds in any year—are pre-empted by federal law mandating that certain zones of labor activity be unregulated.

I

As set forth in the preamble, the State of California enacted AB 1889 for the following purpose:

"It is the policy of the state not to interfere with an employee's choice about whether to join or to be represented by a labor union. For this reason, the state should not subsidize efforts by an employer to assist, promote, or deter union organizing. It is the intent of the Legislature in enacting this act to prohibit an em-

ployer from using state funds and facilities for the purpose of influencing employees to support or oppose unionization and to prohibit an employer from seeking to influence employees to support or oppose unionization while those employees are performing work on a state contract." 2000 Cal. Stats. ch. 872, §1.

AB 1889 forbids certain employers that receive state funds—whether by reimbursement, grant, contract, use of state property, or pursuant to a state program—from using such funds to "assist, promote, or deter union organizing." See Cal. Govt. Code Ann. §§16645.1 to 16645.7. This prohibition encompasses "any attempt by an employer to influence the decision of its employees" regarding "[w]hether to support or oppose a labor organization" and "[w]hether to become a member of any labor organization." §16645(a). The statute specifies that the spending restriction applies to "any expense, including legal and consulting fees and salaries of supervisors and employees, incurred for . . . an activity to assist, promote, or deter union organizing." §16646(a).

Despite the neutral statement of policy quoted above, AB 1889 expressly exempts "activit[ies] performed" or "expense[s] incurred" in connection with certain undertakings that promote unionization, including "[a]llowing a labor organization or its representatives access to the employer's facilities or property," and "[n]egotiating, entering into, or carrying out a voluntary recognition agreement with a labor organization." §§16647(b), (d).

To ensure compliance with the grant and program restrictions at issue in this case, AB 1889 establishes a formidable enforcement scheme. Covered employers must certify that no state funds will be used for prohibited expenditures; the employer must also maintain and provide upon request "records sufficient to show that no state funds were used for those expenditures." §§16645.2(c),

16645.7(b)–(c). If an employer commingles state and other funds, the statute presumes that any expenditures to assist, promote, or deter union organizing derive in part from state funds on a pro rata basis. §16646(b). Violators are liable to the State for the amount of funds used for prohibited purposes plus a civil penalty equal to twice the amount of those funds. §§16645.2(d), 16645.7(d). Suspected violators may be sued by the state attorney general or any private taxpayer, and prevailing plaintiffs are "entitled to recover reasonable attorney's fees and costs." §16645.8(d).

## II

In April 2002, several organizations whose members do business with the State of California (collectively, Chamber of Commerce), brought this action against the California Department of Health Services and appropriate state officials (collectively, the State) to enjoin enforcement of AB 1889. Two labor unions (collectively, AFL–CIO) intervened to defend the statute's validity.

The District Court granted partial summary judgment in favor of the Chamber of Commerce,[1] holding that the National Labor Relations Act (NLRA), 49 Stat. 449, as amended, 29 U. S. C. §151 *et seq.* pre-empts Cal. Govt. Code Ann. §16645.2 (concerning grants) and §16645.7 (concerning program funds) because those provisions "regulat[e] employer speech about union organizing under specified circumstances, even though Congress intended free debate." *Chamber of Commerce* v. *Lockyer*, 225 F. Supp. 2d 1199, 1205 (CD Cal. 2002). The Court of Appeals for the Ninth Circuit, after twice affirming the District Court's judgment, granted rehearing en banc and

---

[1] The District Court held that the Chamber of Commerce lacked standing to challenge several provisions of AB 1889 concerning state contractors and public employers. See *Chamber of Commerce* v. *Lockyer*, 225 F. Supp. 2d 1199, 1202–1203 (CD Cal. 2002).

reversed. See *Chamber of Commerce* v. *Lockyer*, 463 F. 3d 1076, 1082 (2006). While the en banc majority agreed that California enacted §§16645.2 and 16645.7 in its capacity as a regulator, and not as a mere proprietor or market participant, see *id.*, at 1082–1085, it concluded that Congress did not intend to preclude States from imposing such restrictions on the use of their own funds, see *id.*, at 1085–1096. We granted certiorari, 552 U. S. ___ (2007), and now reverse.

Although the NLRA itself contains no express pre-emption provision, we have held that Congress implicitly mandated two types of pre-emption as necessary to implement federal labor policy. The first, known as *Garmon* pre-emption, see *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236 (1959), "is intended to preclude state interference with the National Labor Relations Board's interpretation and active enforcement of the 'integrated scheme of regulation' established by the NLRA." *Golden State Transit Corp.* v. *Los Angeles*, 475 U. S. 608, 613 (1986) *(Golden State I).* To this end, *Garmon* pre-emption forbids States to "regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits." *Wisconsin Dept. of Industry* v. *Gould Inc.*, 475 U. S. 282, 286 (1986). The second, known as *Machinists* pre-emption, forbids both the National Labor Relations Board (NLRB) and States to regulate conduct that Congress intended "be unregulated because left 'to be controlled by the free play of economic forces.'" *Machinists* v. *Wisconsin Employment Relations Comm'n*, 427 U. S. 132, 140 (1976) (quoting *NLRB* v. *Nash-Finch Co.*, 404 U. S. 138, 144 (1971)). *Machinists* pre-emption is based on the premise that "'Congress struck a balance of protection, prohibition, and laissez-faire in respect to union organization, collective bargaining, and labor disputes.'" 427 U. S., at 140, n. 4 (quoting Cox, Labor Law Preemption Revisited, 85 Harv. L. Rev. 1337, 1352 (1972)).

Today we hold that §§16645.2 and 16645.7 are pre-empted under *Machinists* because they regulate within "a zone protected and reserved for market freedom." *Building & Constr. Trades Council* v. *Associated Builders & Contractors of Mass./R. I., Inc.*, 507 U. S. 218, 227 (1993) *(Boston Harbor)*. We do not reach the question whether the provisions would also be pre-empted under *Garmon*.

## III

As enacted in 1935, the NLRA, which was commonly known as the Wagner Act, did not include any provision that specifically addressed the intersection between employee organizational rights and employer speech rights. See 49 Stat. 449. Rather, it was left to the NLRB, subject to review in federal court, to reconcile these interests in its construction of §§7 and 8. Section 7, now codified at 29 U. S. C. §157, provided that workers have the right to organize, to bargain collectively, and to engage in concerted activity for their mutual aid and protection. Section 8(1), now codified at 29 U. S. C. §158(a)(1), made it an "unfair labor practice" for employers to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed by section 7."

Among the frequently litigated issues under the Wagner Act were charges that an employer's attempts to persuade employees not to join a union—or to join one favored by the employer rather than a rival—amounted to a form of coercion prohibited by §8. The NLRB took the position that §8 demanded complete employer neutrality during organizing campaigns, reasoning that any partisan employer speech about unions would interfere with the §7 rights of employees. See 1 J. Higgins, The Developing Labor Law 94 (5th ed. 2006). In 1941, this Court curtailed the NLRB's aggressive interpretation, clarifying that nothing in the NLRA prohibits an employer "from expressing its view on labor policies or problems" unless the em-

ployer's speech "in connection with other circumstances [amounts] to coercion within the meaning of the Act." *NLRB* v. *Virginia Elec. & Power Co.*, 314 U. S. 469, 477 (1941). We subsequently characterized *Virginia Electric* as recognizing the First Amendment right of employers to engage in noncoercive speech about unionization. *Thomas* v. *Collins*, 323 U. S. 516, 537–538 (1945). Notwithstanding these decisions, the NLRB continued to regulate employer speech too restrictively in the eyes of Congress.

Concerned that the Wagner Act had pushed the labor relations balance too far in favor of unions, Congress passed the Labor Management Relations Act, 1947 (Taft-Hartley Act). 61 Stat. 136. The Taft-Hartley Act amended §§7 and 8 in several key respects. First, it emphasized that employees "have the right to refrain from any or all" §7 activities. 29 U. S. C. §157. Second, it added §8(b), which prohibits unfair labor practices by unions. 29 U. S. C. §158(b). Third, it added §8(c), which protects speech by both unions and employers from regulation by the NLRB. 29 U. S. C. §158(c). Specifically, §8(c) provides:

> "The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

From one vantage, §8(c) "merely implements the First Amendment," *NLRB* v. *Gissel Packing Co.*, 395 U. S. 575, 617 (1969), in that it responded to particular constitutional rulings of the NLRB. See S. Rep. No. 105, 80th Cong., 1st Sess., pt. 2, pp. 23–24 (1947). But its enactment also manifested a "congressional intent to encourage free debate on issues dividing labor and management."

*Linn* v. *Plant Guard Workers*, 383 U. S. 53, 62 (1966). It is indicative of how important Congress deemed such "free debate" that Congress amended the NLRA rather than leaving to the courts the task of correcting the NLRB's decisions on a case-by-case basis. We have characterized this policy judgment, which suffuses the NLRA as a whole, as "favoring uninhibited, robust, and wide-open debate in labor disputes," stressing that "freewheeling use of the written and spoken word . . . has been expressly fostered by Congress and approved by the NLRB." *Letter Carriers* v. *Austin*, 418 U. S. 264, 272–273 (1974).

Congress' express protection of free debate forcefully buttresses the pre-emption analysis in this case. Under *Machinists*, congressional intent to shield a zone of activity from regulation is usually found only "implicit[ly] in the structure of the Act," *Livadas* v. *Bradshaw*, 512 U. S. 107, 117, n. 11 (1994), drawing on the notion that "'[w]hat Congress left unregulated is as important as the regulations that it imposed,'" *Golden State Transit Corp.* v. *Los Angeles*, 493 U. S. 103, 110 (1989) *(Golden State II)* (quoting *New York Telephone Co.* v. *New York State Dept. of Labor*, 440 U. S. 519, 552 (1979) (Powell, J., dissenting)). In the case of noncoercive speech, however, the protection is both implicit and explicit. Sections 8(a) and 8(b) demonstrate that when Congress has sought to put limits on advocacy for or against union organization, it has expressly set forth the mechanisms for doing so. Moreover, the amendment to §7 calls attention to the right of employees to refuse to join unions, which implies an underlying right to receive information opposing unionization. Finally, the addition of §8(c) expressly precludes regulation of speech about unionization "so long as the communications do not contain a 'threat of reprisal or force or promise of benefit.'" *Gissel Packing*, 395 U. S., at 618.

The explicit direction from Congress to leave noncoercive speech unregulated makes this case easier, in at least

one respect, than previous NLRA cases because it does not require us "to decipher the presumed intent of Congress in the face of that body's steadfast silence." *Sears, Roebuck & Co.* v. *Carpenters*, 436 U. S. 180, 188, n. 12 (1978). California's policy judgment that partisan employer speech necessarily "interfere[s] with an employee's choice about whether to join or to be represented by a labor union," 2000 Cal. Stats. ch. 872, §1, is the same policy judgment that the NLRB advanced under the Wagner Act, and that Congress renounced in the Taft-Hartley Act. To the extent §§16645.2 and 16645.7 actually further the express goal of AB 1889, the provisions are unequivocally pre-empted.

## IV

The Court of Appeals concluded that *Machinists* did not pre-empt §§16645.2 and 16645.7 for three reasons: (1) the spending restrictions apply only to the *use* of state funds, (2) Congress did not leave the zone of activity free from *all* regulation, and (3) California modeled AB 1889 on federal statutes. We find none of these arguments persuasive.

*Use of State Funds*

In NLRA pre-emption cases, "'judicial concern has necessarily focused on the nature of the activities which the States have sought to regulate, rather than on the method of regulation adopted.'" *Golden State I*, 475 U. S., at 614, n. 5 (quoting *Garmon*, 359 U. S., at 243; brackets omitted); see also *Livadas*, 512 U. S., at 119 ("Pre-emption analysis . . . turns on the actual content of [the State's] policy and its real effect on federal rights"). California plainly could not directly regulate noncoercive speech about unionization by means of an express prohibition. It is equally clear that California may not indirectly regulate such conduct by imposing spending restrictions on the use of state funds.

In *Gould*, we held that Wisconsin's policy of refusing to purchase goods and services from three-time NLRA violators was pre-empted under *Garmon* because it imposed a "supplemental sanction" that conflicted with the NLRA's "'integrated scheme of regulation.'" 475 U. S., at 288–289. Wisconsin protested that its debarment statute was "an exercise of the State's spending power rather than its regulatory power," but we dismissed this as "a distinction without a difference." *Id.*, at 287. "[T]he point of the statute [was] to deter labor law violations," and "for all practical purposes" the spending restriction was "tantamount to regulation." *Id.*, at 287–289. Wisconsin's choice "to use its spending power rather than its police power d[id] not significantly lessen the inherent potential for conflict" between the state and federal schemes; hence the statute was pre-empted. *Id.*, at 289.

We distinguished *Gould* in *Boston Harbor*, holding that the NLRA did not preclude a state agency supervising a construction project from requiring that contractors abide by a labor agreement. We explained that when a State acts as a "market participant with no interest in setting policy," as opposed to a "regulator," it does not offend the pre-emption principles of the NLRA. 507 U. S., at 229. In finding that the state agency had acted as a market participant, we stressed that the challenged action "was specifically tailored to one particular job," and aimed "to ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost." *Id.*, at 232.

It is beyond dispute that California enacted AB 1889 in its capacity as a regulator rather than a market participant. AB 1889 is neither "specifically tailored to one particular job" nor a "legitimate response to state procurement constraints or to local economic needs." *Gould*, 475 U. S., at 291. As the statute's preamble candidly acknowledges, the legislative purpose is not the efficient

procurement of goods and services, but the furtherance of a labor policy. See 2000 Cal. Stats. ch. 872, §1. Although a State has a legitimate proprietary interest in ensuring that state funds are spent in accordance with the purposes for which they are appropriated, this is not the objective of AB 1889. In contrast to a neutral affirmative requirement that funds be spent solely for the purposes of the relevant grant or program, AB 1889 imposes a targeted negative restriction on employer speech about unionization. Furthermore, the statute does not even apply this constraint uniformly. Instead of forbidding the use of state funds for *all* employer advocacy regarding unionization, AB 1889 permits use of state funds for *select* employer advocacy activities that promote unions. Specifically, the statute exempts expenses incurred in connection with, *inter alia*, giving unions access to the workplace, and voluntarily recognizing unions without a secret ballot election. §§16647(b), (d).

The Court of Appeals held that although California did not act as a market participant in enacting AB 1889, the NLRA did not pre-empt the statute. It purported to distinguish *Gould* on the theory that AB 1889 does not make employer neutrality a condition for *receiving* funds, but instead restricts only the *use* of funds. According to the Court of Appeals, this distinction matters because when a State imposes a "use" restriction instead of a "receipt" restriction, "an employer has and retains the freedom to spend its own funds however it wishes." 463 F. 3d, at 1088.

California's reliance on a "use" restriction rather than a "receipt" restriction is, at least in this case, no more consequential than Wisconsin's reliance on its spending power rather than its police power in *Gould*. As explained below, AB 1889 couples its "use" restriction with compliance costs and litigation risks that are calculated to make union-related advocacy prohibitively expensive for employers

that receive state funds. By making it exceedingly difficult for employers to demonstrate that they have not used state funds and by imposing punitive sanctions for non-compliance, AB 1889 effectively reaches beyond "the use of funds over which California maintains a sovereign interest." Brief for State Respondents 19.

Turning first to the compliance burdens, AB 1889 requires recipients to "maintain records sufficient to show that no state funds were used" for prohibited expenditures, §§16645.2(c), 16645.7(c), and conclusively presumes that any expenditure to assist, promote, or deter union organizing made from "commingled" funds constitutes a violation of the statute, §16646(b). Maintaining "sufficient" records and ensuring segregation of funds is no small feat, given that AB 1889 expansively defines its prohibition to encompass "any expense" incurred in "any attempt" by an employer to "influence the decision of its employees." §§16645(a), 16646(a). Prohibited expenditures include not only discrete expenses such as legal and consulting fees, but also an allocation of overhead, including "salaries of supervisors and employees," for any time and resources spent on union-related advocacy. See §16646(a). The statute affords no clearly defined safe harbor, save for expenses incurred in connection with activities that either favor unions or are required by federal or state law. See §16647.

The statute also imposes deterrent litigation risks. Significantly, AB 1889 authorizes not only the California Attorney General but also any private taxpayer—including, of course, a union in a dispute with an employer—to bring a civil action against suspected violators for "injunctive relief, damages, civil penalties, and other appropriate equitable relief." §16645.8. Violators are liable to the State for three times the amount of state funds deemed spent on union organizing. §§16645.2(d), 16645.7(d), 16645.8(a). Prevailing plaintiffs, and certain

prevailing taxpayer intervenors, are entitled to recover attorney's fees and costs, §16645.8(d), which may well dwarf the treble damages award. Consequently, a trivial violation of the statute could give rise to substantial liability. Finally, even if an employer were confident that it had satisfied the recordkeeping and segregation requirements, it would still bear the costs of defending itself against unions in court, as well as the risk of a mistaken adverse finding by the factfinder.

In light of these burdens, California's reliance on a "use" restriction rather than a "receipt" restriction "does not significantly lessen the inherent potential for conflict" between AB 1889 and the NLRA. *Gould*, 475 U. S., at 289. AB 1889's enforcement mechanisms put considerable pressure on an employer either to forgo his "free speech right to communicate his views to his employees," *Gissel Packing*, 395 U. S., at 617, or else to refuse the receipt of any state funds. In so doing, the statute impermissibly "predicat[es] benefits on refraining from conduct protected by federal labor law," *Livadas*, 512 U. S., at 116, and chills one side of "the robust debate which has been protected under the NLRA," *Letter Carriers*, 418 U. S., at 275.

Resisting this conclusion, the State and the AFL–CIO contend that AB 1889 imposes less onerous recordkeeping restrictions on governmental subsidies than do federal restrictions that have been found not to violate the First Amendment. See *Rust* v. *Sullivan*, 500 U. S. 173 (1991); *Regan* v. *Taxation With Representation of Wash.*, 461 U. S. 540 (1983). The question, however, is not whether AB 1889 violates the First Amendment, but whether it "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives'" of the NLRA. *Livadas*, 512 U. S., at 120 (quoting *Brown* v. *Hotel Employees*, 468 U. S. 491, 501 (1984)). Constitutional standards, while sometimes analogous, are not tailored to address the object of labor pre-emption analysis: giving

effect to Congress' intent in enacting the Wagner and Taft-Hartley Acts. See *Livadas*, 512 U. S., at 120 (distinguishing standards applicable to the Equal Protection and Due Process Clauses); *Gould*, 475 U. S., at 290 (Commerce Clause); *Linn*, 383 U. S., at 67 (First Amendment). Although a State may "choos[e] to fund a program dedicated to advance certain permissible goals," *Rust*, 400 U. S., at 194, it is not "permissible" for a State to use its spending power to advance an interest that—even if legitimate "in the absence of the NLRA," *Gould*, 475 U. S., at 290—frustrates the comprehensive federal scheme established by that Act.

*NLRB Regulation*

We have characterized *Machinists* pre-emption as "creat[ing] a zone free from all regulations, whether state or federal." *Boston Harbor*, 507 U. S., at 226. Stressing that the NLRB has regulated employer speech that takes place on the eve of union elections, the Court of Appeals deemed *Machinists* inapplicable because "employer speech in the context of organizing" is not a zone of activity that Congress left free from "*all* regulation." See 463 F. 3d, at 1089 (citing *Peoria Plastic Co.*, 117 N. L. R. B. 545, 547–548 (1957) (barring employer interviews with employees in their homes immediately before an election); *Peerless Plywood Co.*, 107 N. L. R. B. 427, 429 (1953) (barring employers and unions alike from making election speeches on company time to massed assemblies of employees within the 24-hour period before an election)).

The NLRB has policed a narrow zone of speech to ensure free and fair elections under the aegis of §9 of the NLRA, 29 U. S. C. §159. Whatever the NLRB's regulatory authority within special settings such as imminent elections, however, Congress has clearly denied it the authority to regulate the broader category of noncoercive speech encompassed by AB 1889. It is equally obvious that the

NLRA deprives California of this authority, since "'[t]he States have no more authority than the Board to upset the balance that Congress has struck between labor and management.'" *Metropolitan Life Ins. Co.* v. *Massachusetts*, 471 U. S. 724, 751 (1985).

*Federal Statutes*

Finally, the Court of Appeals reasoned that Congress could not have intended to pre-empt AB 1889 because Congress itself has imposed similar restrictions. See 463 F. 3d, at 1090–1091. Specifically, three federal statutes include provisions that forbid the use of particular grant and program funds "to assist, promote, or deter union organizing."[2] We are not persuaded that these few isolated restrictions, plucked from the multitude of federal spending programs, were either intended to alter or did in fact alter the "'wider contours of federal labor policy.'" *Metropolitan Life*, 471 U. S., at 753.

A federal statute will contract the pre-emptive scope of the NLRA if it demonstrates that "Congress has decided to tolerate a substantial measure of diversity" in the particular regulatory sphere. *New York Telephone*, 440 U. S., at 546 (plurality opinion). In *New York Telephone*, an employer challenged a state unemployment system that provided benefits to employees absent from work during lengthy strikes. The employer argued that the state system conflicted with the federal labor policy "of allowing the free play of economic forces to operate during the bargain-

_____

[2] See 29 U. S. C. §2931(b)(7) ("Each recipient of funds under [the Workforce Investment Act] shall provide to the Secretary assurances that none of such funds will be used to assist, promote, or deter union organizing"); 42 U. S. C. §9839(e) ("Funds appropriated to carry out [the Head Start Programs Act] shall not be used to assist, promote, or deter union organizing"); §12634(b)(1) ("Assistance provided under [the National Community Service Act] shall not be used by program participants and program staff to . . . assist, promote, or deter union organizing").

ing process." *Id.*, at 531. We upheld the statute on the basis that the legislative histories of the NLRA and Social Security Act, which were enacted within six weeks of each other, confirmed that "Congress intended that the States be free to authorize, or to prohibit, such payments." *Id.*, at 544; see also *id.*, at 547 (Brennan, J., concurring in result); *id.*, at 549 (Blackmun, J., concurring in judgment). Indeed, the tension between the Social Security Act and the NLRA suggested that the case could "be viewed as presenting a potential conflict between two federal statutes . . . rather than between federal and state regulatory statutes." *Id.*, at 539–540, n. 32.

The three federal statutes relied on by the Court of Appeals neither conflict with the NLRA nor otherwise establish that Congress "decided to tolerate a substantial measure of diversity" in the regulation of employer speech. Unlike the States, Congress has the authority to create tailored exceptions to otherwise applicable federal policies, and (also unlike the States) it can do so in a manner that preserves national uniformity without opening the door to a 50-state patchwork of inconsistent labor policies. Consequently, the mere fact that Congress has imposed targeted federal restrictions on union-related advocacy in certain limited contexts does not invite the States to override federal labor policy in other settings.

Had Congress enacted a federal version of AB 1889 that applied analogous spending restrictions to *all* federal grants or expenditures, the pre-emption question would be closer. Cf. *Metropolitan Life*, 471 U. S., at 755 (citing federal minimum labor standards as evidence that Congress did not intend to pre-empt state minimum labor standards). But none of the cited statutes is Government-wide in scope, none contains comparable remedial provisions, and none contains express pro-union exemptions.

\*      \*      \*

The Court of Appeals' judgment reversing the summary judgment entered for the Chamber of Commerce is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 06–939

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, ET AL., PETITIONERS *v.* EDMUND G. BROWN, JR., ATTORNEY GENERAL OF CALIFORNIA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 19, 2008]

JUSTICE BREYER, with whom JUSTICE GINSBURG joins, dissenting.

California's spending statute sets forth a state "policy" not to "subsidize efforts by an employer to assist, promote, or deter union organizing." 2000 Cal. Stats. ch. 872, §1. The operative sections of the law prohibit several classes of employers who receive state funds from using those funds to "assist, promote, or deter union organizing." Cal. Govt. Code Ann. §§16645–16649 (West Supp. 2008). And various compliance provisions then require maintenance of "records sufficient to show that no state funds were used" for prohibited expenditures, deter the use of commingled funds for prohibited expenditures, and impose serious penalties upon violators. §§16645.2(c), 16645.7(b)–(c).

The Court finds that the National Labor Relations Act (NLRA) pre-empts these provisions. It does so, for it believes the provisions "*regulate*" activity that Congress has intended to "be unregulated because left to be controlled by the free play of economic forces." *Machinists* v. *Wisconsin Employment Relations Comm'n*, 427 U. S. 132, 140 (1976) (internal quotation marks omitted and emphasis added). The Chamber of Commerce adds that the

NLRA pre-empts these provisions because they "*regulate* activity that the NLRA protects, prohibits, or arguably protects or prohibits." *Wisconsin Dept. of Industry* v. *Gould Inc.*, 475 U. S. 282, 286 (1986) (summarizing the pre-emption principle set forth in *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236 (1959); emphasis added). Thus the question before us is whether California's spending limitations amount to *regulation* that the NLRA pre-empts. In my view, they do not.

I

The operative sections of the California statute provide that employers who wish to "assist, promote or deter union organizing," cannot use state money when they do so. The majority finds these provisions pre-empted because in its view the sections regulate employer speech in a manner that weakens, or undercuts, a congressional policy, embodied in NLRA §8(c), "'to encourage free debate on issues dividing labor and management.'" *Ante*, at 6–7 (citing *Linn* v. *Plant Guard Workers*, 383 U. S. 53, 62 (1966)).

Although I agree the congressional policy favors "free debate," I do not believe the operative provisions of the California statute amount to impermissible regulation that interferes with that policy as Congress intended it. First, the only relevant Supreme Court case that found a State's labor-related spending limitations to be pre-empted differs radically from the case before us. In that case, *Wisconsin Dept. of Industry* v. *Gould Inc.*, 475 U. S. 282, the Court considered a Wisconsin statute that prohibited the State from doing business with firms that repeatedly violated the NLRA. The Court said that the statute's "manifest purpose and inevitable effect" was "to enforce" the NLRA's requirements, which "role Congress reserved exclusively for the [National Labor Relations Board]." *Id.*, at 291. In a word, the Wisconsin statute sought "to *compel* conformity with the NLRA." *Building & Constr. Trades*

*Council* v. *Associated Builders & Contractors of Mass./R. I., Inc.*, 507 U. S. 218, 228 (1993) (emphasis added).

California's statute differs from the Wisconsin statute because it does not seek to compel labor-related activity. Nor does it seek to forbid labor-related activity. It permits all employers who receive state funds to "assist, promote, or deter union organizing." It simply says to those employers, do not do so on our dime. I concede that a federal law that forces States to pay for labor-related speech from public funds would encourage *more* of that speech. But no one can claim that the NLRA is such a law. And without such a law, a State's refusal to pay for labor-related speech does not *impermissibly* discourage that activity. To refuse to pay for an activity (as here) is not the same as to compel others to engage in that activity (as in *Gould*).

Second, California's operative language does not weaken or undercut Congress' policy of "encourag[ing] free debate on issues dividing labor and management." *Linn*, *supra*, at 62. For one thing, employers remain free to spend *their own* money to "assist, promote, or deter" unionization. More importantly, I cannot conclude that California's statute would weaken or undercut any such congressional policy because Congress itself has enacted three statutes that, *using identical language,* do precisely the same thing. Congress has forbidden recipients of Head Start funds from using the funds to "assist, promote, or deter union organizing." 42 U. S. C. §9839(e). It has forbidden recipients of Workforce Investment Act of 1998 funds from using the funds to "assist, promote, or deter union organizing." 29 U. S. C. §2931(b)(7). And it has forbidden recipients of National Community Service Act of 1990 funds from using the funds to "assist, promote, or deter union organizing." 42 U. S. C. §12634(b)(1). Could Congress have thought that the NLRA would prevent the States from enacting the very same kinds of laws that Congress itself has enacted? Far more likely, Congress thought that

directing government funds away from labor-related activity was *consistent*, not *inconsistent*, with, the policy of "encourag[ing] free debate" embedded in its labor statutes.

Finally, the law normally gives legislatures broad authority to decide how to spend the People's money. A legislature, after all, generally has the right *not* to fund activities that it would prefer not to fund—even where the activities are otherwise protected. See, *e.g.*, *Regan* v. *Taxation With Representation of Wash.*, 461 U. S. 540, 549 (1983) ("We have held in several contexts that a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right"). This Court has made the same point in the context of labor law. See *Lyng* v. *Automobile Workers*, 485 U. S. 360, 368 (1988) (holding that the Federal Government's refusal to provide food stamp benefits to striking workers was justified because "[s]trikers and their union would be much better off if food stamps were available," but the "strikers' right of association does not require the Government to furnish funds to maximize the exercise of that right").

As far as I can tell, States that *do* wish to pay for employer speech are generally free to do so. They might make clear, for example, through grant-related rules and regulations that a grant recipient can use the funds to pay salaries and overhead, which salaries and overhead might include expenditures related to management's role in labor organizing contests. If so, why should States that do *not* wish to pay be deprived of a similar freedom? Why should they be conscripted into paying?

I can find nothing in the majority's arguments that convincingly answers these questions. The majority says that California *must* be acting as an impermissible regulator because it is not acting as a "market participant" (a role we all agree would permit it broad leeway to act like private firms in respect to labor matters). *Ante*, at 9. But the regulator/market-participant distinction suggests a

false dichotomy. The converse of "market participant" is not necessarily "regulator." A State may appropriate funds without either participating in or regulating the labor market. And the NLRA pre-empts a State's actions, when taken as an "appropriator," only if those actions amount to impermissible regulation. I have explained why I believe that California's actions do not amount to impermissible regulation here.

The majority also complains that the statute "imposes a targeted negative restriction," one applicable only to labor. *Ante*, at 10. I do not find this a fatal objection, because the congressional statutes just discussed (which I believe are consistent with the NLRA) do exactly the same. In any event, if, say, a State can tell employers not to use state funds to pay for a large category of expenses (say, overhead), why can it not tell employers the same about a smaller category of expenses (say, only those overhead expenses related to taking sides in a labor contest). And where would the line then be drawn? Would the statute pass master if California had said, do not use our money to pay for interior decorating, catered lunches, or labor relations?

The majority further objects to the fact that the statute does not "apply" the constraint "uniformly," because it permits use of state funds for "*select* employer advocacy activities that promote unions." *Ante*, at 10. That last phrase presumably refers to an exception in the California statute that permits employers to spend state funds to negotiate a voluntary recognition of a union. But this exception underscores California's basic purpose— maintaining a position of spending neutrality on *contested* labor matters. Where labor and management agree on unionization, there is no conflict.

## II

I turn now to the statute's compliance provisions. They

require grant recipients to maintain "records sufficient to show that no state funds were used" for prohibited expenditures; they deter the use of commingled funds for prohibited expenditures; and they impose serious penalties upon violators. Cal. Govt. Code Ann. §§16645.2(c), 16645.7(b)–(c). The majority seems to rest its conclusions in part upon its belief that these requirements are too strict, that, under the guise of neutral enforcement, they discourage the use of *nonstate* money to engage in free debate on labor/management issues. *Ante*, at 10–11.

I agree with the majority that, should the compliance provisions, as a practical matter, unreasonably discourage expenditure of *nonstate* funds, the NLRA may well preempt California's statute. But I cannot say on the basis of the record before us that the statute will have that effect.

The language of the statute is clear. The statute requires recipients of state money to "maintain records sufficient to show that no state funds were used" for prohibited expenditures. §§16645.2, 16645.7(c). And the class of prohibited expenditures is quite broad: It covers "*any* expense" incurred in "any attempt" by an employer to "influence the decision of its employees," including "legal and consulting fees and salaries of supervisors and employees" incurred during research for or the preparation, planning, coordination, or execution of activities to "assist, promote, or deter" union organizing. §16646(a) (emphasis added). And where an employer mingles state funds and non-state funds, (say, to pay a particular employee who spends part of her time dealing with unionization matters) the employer must determine "on a pro rata basis," the portion of the labor-related expenditure paid for by state funds, and maintain sufficient supporting documentation. §16646(b). Any violation of these provisions is then subject to strict penalties, including treble damages and attorney's fees and costs. §16645.8.

What is less clear is the degree to which these provi-

sions actually will deter a recipient of state funds from using non-state funds to engage in unionization matters. And no lower court has ruled on this matter. In the District Court, the Chamber of Commerce moved for summary judgment arguing that the statute, by placing restrictions on state funds, was pre-empted by *Machinists* and *Garmon* and also arguing that the compliance provisions are so burdensome that they would chill even private expenditures. California opposed the motion. And California submitted expert evidence designed to show that its "accounting and recordkeeping requirements . . . are similar to requirements imposed in other contexts," are "significantly less burdensome than the detailed requirements for federal grant recipients," and allow "flexibility in establishing proper accounting procedures and controls." App. 282–283.

The District Court granted the Chamber of Commerce's motion for summary judgment in part, finding that the operative sections of the statute were pre-empted for the reasons I have discussed in Part I, namely, that the operative provisions interfered with the NLRA's policy of encouraging "free debate." 225 F. Supp. 2d 1199, 1204 (CD Cal. 2002). But in doing so, it did not address the Chamber of Commerce's argument that the California statute's compliance provisions affected non-state-funded speech to the point that the NLRA pre-empted the statute. Neither did the Court of Appeals address the question whether the compliance provisions themselves constitute sufficient grounds for finding the statute pre-empted.

I do not believe that we can, and I would not, decide this question until the lower courts have had an opportunity to consider and rule upon the compliance-related questions. Accordingly, I would vote to vacate the judgment of the Ninth Circuit and remand for further proceedings on this issue.

I respectfully dissent.